J-S17018-21; J-S17019-21

2021 PA Super 168

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 15 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2020-00030

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.G.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 16 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-31 of 2020

| | | |
|---|---|---|
| IN RE:  ADOPTION OF: K.H.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 17 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-32 of 2020

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.J.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  |  |  |  |
|---|---|---|---|
|  | : | | |
|  | : | | |
|  | : | | |
| APPEAL OF: E.C., MOTHER | : | | |
|  | : | | |
|  | : | | |
|  | : | | |
|  | : | | |
|  | : | No. 18 MDA 2021 | |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-33 of 2020

|  |  |  |
|---|---|---|
| IN RE: ADOPTION OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : | |
|  | : | |
| APPEAL OF: E.C., MOTHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 19 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-34 of 2020

|  |  |  |
|---|---|---|
| IN RE: ADOPTION OF K.M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : | |
|  | : | |
| APPEAL OF: A.D., FATHER | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | |
|  | : | No. 20 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2020-00030

|  |  |  |
|---|---|---|
| IN RE: ADOPTION OF M.G.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : | |
|  | : | |

- 2 -

APPEAL OF: A.D., FATHER      :
               :
               :
               :
               :
               :   No. 21 MDA 2021

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2020-00031

| IN RE: ADOPTION OF K.H.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 22 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): 2020-00032

| IN RE: ADOPTION OF: C.J.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 23 MDA 2021 |

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): A-33 of 2020

| IN RE: ADOPTION OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |

J-S17018-21; J-S17019-21

:    No. 24 MDA 2021

Appeal from the Order Entered October 23, 2020
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-34 of 2020

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY KUNSELMAN, J.:                **FILED: AUGUST 19, 2021**

In these matters, E.C. (Mother) and A.D. (Father) (collectively, the Parents) appeal the orders of the Lackawanna County Orphans' Court that involuntarily terminated their rights to their five Children (9-year-old A.D.; 10-year-old twins K.M.D. and M.G.D.; 12-year-old C.J.D.; and 14-year-old K.H.D.), pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).  Because the Parents raise the same issues, we address their appeals together.  The Parents argue, *inter alia*, that the Lackawanna County Office of Children Youth and Families (the Agency) did not properly serve them with the termination petitions in accordance with the Adoption Act and the Pennsylvania Orphans' Court Rules.  *See* 23 Pa.C.S.A. § 2513(a)-(b); *see also* Pa.O.C. Rule 15.6.  The Parents allege that the circumvention of these procedures constituted a violation of their rights to due process.  After careful review, we agree.  We therefore vacate the termination orders and remand for further proceedings.

Given our disposition, we abbreviate the factual and procedural background as follows:  The family came to the attention of the Agency in

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 4 -

2017 following allegations that the family had inadequate hygiene and clothing, and that there was inappropriate discipline and domestic violence in the home. Notably, some of the Children disclosed sexual abuse by a family friend. The named abuser was subsequently incarcerated for the offense the following year, but the Agency was concerned that the Parents knew about the abuse and continued to allow the abuser access to the Children. The Agency also feared the Children suffered from medical neglect; A.D. was nonverbal, had environmentally induced seizures, and had 15 cavities; C.J.D. had scoliosis, which required surgical intervention after having been left untreated; and K.H.D. was hospitalized early in the dependency case after making suicidal statements and attempting to harm C.J.D. for reminding her of the Parents.

The Children entered the Agency's care in February 2018, and the trial court adjudicated them dependent in April 2018. The court ordered family service plans to aid reunification, but the Parents generally failed to comply. However, there was a brief period – between August and December 2019 – where three of the five Children were returned to the Parents' home on a trial basis; the oldest, K.H.D., was never returned, because she refused to have any contact with the Parents, and the youngest, A.D., was too medically fragile to stay with the Parents beyond weekend visitations.

During the four-month reunification, the Agency assisted the family with significant services, including daily food orders, bus passes and gas cards, furnishing their home after multiple evictions, and paying their bills. Even

with these supports in place, Mother was hostile toward the Agency workers. The brief reunification came to an end in December 2019. When Mother learned the Agency would cease its financial support, she became hostile at the courthouse and terrified the Children in the process. Sheriff deputies arrested Mother after the incident. In January 2020, the Agency advised the Parents they would seek termination. After receiving this news, Mother threated certain Agency workers, which led to another arrest.

Meanwhile, the Children were placed in various foster homes. C.J.D. and A.D. were placed together in one pre-adoptive home, which was particularly attentive to A.D.'s special needs. K.H.D. and her younger sibling M.G.D. were placed together in a separate pre-adoptive foster home; K.M.D. (the twin of M.G.D.) had been placed in this home as well, but she was removed after she allegedly threatened another individual in the home. According to the court, this allegation was determined to be unfounded, but at the time of the termination hearing, the Agency was still looking for a permanent resource for K.M.D.

The Agency filed the termination petitions on September 3, 2020. Due to the Covid-19 pandemic, the orphans' court held the termination hearing *via* videoconference on October 13, 2020. The Parents were not in attendance. At the start of the hearing, the Parents' respective attorneys motioned to withdraw. Counsel for Mother explained that Mother left a voicemail on October 9, four days before the hearing, informing him that Mother did not want him as her attorney, and that he should take the necessary steps to

withdraw. Counsel tried to call Mother to ask whether it was her intention to represent herself or seek new counsel. Mother did not return the call. *See* N.T., 10/13/20 at 7-8.

Similarly, counsel for Father had sought to contact Father in preparation of the termination hearing. Father responded with a voicemail, also on October 9, indicating that he was firing her as his attorney, and that she should take the necessary steps to withdraw. Counsel for Father attempted to return Father's message so she could forward the necessary information to his new attorney, if he had one. Father did not return the call. *Id.* at 8-9.

During the hearing, the attorneys for the Parents explained they were not requesting a continuance, but that they did not know how the court would like them to proceed. The attorneys also noted that the Parents had threatened to report them to the disciplinary board if they maintained their representation. The court sympathized with the attorneys for the predicament they were in and thanked them for their advocacy. The court conveyed that it did not fault counsel for the Parents' unresponsiveness, opining that the Parents "have been extremely obstreperous," and noted that "they haven't cooperated ever[.]" *Id.* at 9; 14. Still, the court denied the motions to withdraw, determining that the Parents' requests were delay tactics, and that their respective attorneys could still effectively represent the Parents since they knew the case better than anyone. *Id.* at 17.

The court then proceeded with the hearing, and the Parents' counsel continued to zealously represent their clients. During the cross-examination

of Agency Caseworker Lisa Herie, it was revealed that the Agency effectuated service of the termination petitions by emailing the petitions to a "family email address" (notwithstanding the fact that the email was in Mother's name). There was doubt whether the Agency even attempted to serve the Parents, either personally, or at their residence, or by certified mail. In any event, it was undisputed that the Agency did not accomplish the same. Caseworker Herie testified that Father told her they received the email when Father met with Caseworker Herie to collect bus passes.

At this juncture, counsel for the Parents presented a joint, oral motion to discontinue the hearing. After some discussion the court concluded that, while the Agency did not strictly comply with Pa.O.C. Rule 15.6(a), the Parents had actual knowledge of the proceedings. The court denied the request, and the hearing proceeded with the next witnesses. The court ultimately issued orders terminating the Parents' rights on October 23, 2020.

Although the Parents raise five issues for our review, we only address the first issue because it compels our result:

> 1. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in concluding [the Parents] had been "served" with the petition for involuntary termination as that term is defined under Pa.O.C.R. 15.6?

*See* Mother's Brief at 4; *see also* Father's Brief at 6 (superfluous capitalization omitted).

The Parents' first claim presents a question of law requiring us to interpret the notice requirements of the Adoption Act and our Rules of Orphan Court Procedure. Thus, our standard of review is *de novo* and our scope of review is plenary. ***See Interest of K.P.***, 199 A.3d 899, 901 (Pa. Super. 2018).

We begin with the observation that issues involving proper service of notice in termination proceedings have a constitutional underpinning. The Fourteenth Amendment provides, in relevant part: "nor shall the State deprive any person of life, ***liberty***, or property, without due process of law…." U.S. Const. Amend. 14. (emphasis added). Among the oldest of "fundamental liberty interests" recognized by the Constitution is a parent's right to make decisions concerning the care, custody, and control of his or her children. ***In re D.C.D.***, 105 A.3d 662, 667 (Pa. 2014); ***see also Troxel v. Granville***, 530 57, 65 (2000) (citing, *inter alia*, ***Meyer v. Nebraska***, 262 U.S. 360, 399, 401 (1923) ("liberty" protected by Due Process Clause includes right of parents to "establish a home and bring up children" and to "control the education of their own")).

Naturally then, it is well-settled that any individual whose parental rights are to be terminated must be afforded due process – that is, certain procedural safeguards. ***See In re A.N.P.***, 155 A.3d 55, 66 (Pa. Super. 2017) (citing ***In re Interest of K.B.***, 763 A.2d 436, 439 (Pa. Super. 2000)); ***see also Santosky v. Kramer,*** 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child

does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." ***A.N.P.***, 155 A.3d at 66. (citation omitted). Although we have explained that due process "is flexible and calls for such procedural protections as the situation demands," we are unwilling to allow the termination of parental rights "without **strict compliance** with the procedures set forth by the Legislature…." ***Id.*** at 66, 68 (citing ***In re Adoption of K.G.M.***, 845 A.2d 861, 865 (Pa. Super. 2004)) (further citation omitted) (emphasis added).

Strict compliance is warranted in termination matters because of the gravity of such cases. Given the "complete and irrevocable" nature of the decision, our Supreme Court has explained that "termination of parental rights is one of the most serious and severe steps a court can take[.]" ***In re Adoption of M.R.D.***, 145 A.3d 1117, 1129 (Pa. 2016) (citation omitted). Indeed, the High Court has equated a decree terminating parental rights as the "civil law equivalent to the death penalty, forever obliterating the fundamental legal relationships between parent and child." ***In Re: Adoption of: C.M.***, --- A.3d ---, 2021 WL 3073624, at *12 (Pa. July 21, 2021) (citation omitted); ***see also Kimock v. Jones***, 47 A.3d 850, 855 (Pa. Super. 2012) ("termination of parental rights for all practical purposes ends the parent/child relationship as unequivocally as the death of the child"); ***and see*** Administration Office of Pennsylvania Court's Office of Children and Families

in the Courts, *Pennsylvania Dependency Benchbook*, "Termination of Parental Rights" at § 17.1 (3d ed. 2019) (Termination of parental rights "has often been called the 'death penalty' of dependency court, because of the seriousness and finality of a termination order severing all ties between a child and the biological parents.").

Having underscored the constitutional rights implicated, and the necessity for strict compliance with procedure, we identify the specific procedures at issue here. The Adoption Act explicitly addresses the notice requirement in matters concerning the involuntary termination of parental rights, and how that notice shall be served:

**§ 2513. Hearing**

> **(a) Time**.--The court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for involuntary termination) which shall be not less than ten days after filing of the petition.
>
> **(b) Notice**.--At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require. […]

23 Pa.C.S.A. § 2513(a)-(b).

Moreover, the Pennsylvania Orphans' Court Rule 15.6 provides, in relevant part:

> **Rule 15.6. Notice to Persons; Method; Notice of Orphans' Court Proceedings Filed on Dependency Docket**

- 11 -

(a) Notice to every person to be notified shall be by personal service, service at her or her residence on an adult member of the household, or by registered or certified mail to her or her last known address. **If** such service is unobtainable and the registered mail is returned undelivered, **then**:

[…]

(2) in proceedings [relating to the involuntary termination of parental rights], further notice by publication or otherwise shall be given if required by general rule or special order of the local Orphans' Court. If, after reasonable investigation, the identity of a person to be notified is unknown, notice to him or her shall not be required.

Pa.O.C. Rule 15.6(a)(2) (emphasis added).

We add that this Court has required a "good faith" effort to provide notice to a parent, at his or her correct address, of a hearing that may result in the termination of the individual's parental rights. **K.G.M.**, 845 A.2d at 864 (citing **Adoption of Walker**, 360 A.2d 603, 607 (Pa. 1976)). Finally, we note the children and youth services agency "bears the burden to prove proper service by its affirmative act." **A.N.P.**, 155 A.3d at 66 (citing, *inter alia*, **Leight v. Lefkowitz**, 615 A.2d 751, 753 (Pa. Super. 1992)). As "disappointing and uncooperative" a respondent's acts of refusing service may be, it is the petitioner "who must prove service by…affirmative acts, and not the [respondent] by [his or] her acts of omission or rejection." **See Leight**, 615 A.2d at 753.

Turning now to the facts of this case, we clarify from the beginning that the question is not whether service on the Parents was unobtainable under

Rule 15.6(a), which might have created a predicate for alternative service under Rule. 15.6(a)(2). The Parents' address was known by the Agency, and the Agency conceded that neither personal service, nor service by certified mail, was accomplished – and apparently never even attempted. Rather, the question here is whether the Agency effectuated proper service *via* email, or in the alternative, whether the Parents' actual knowledge of the proceedings excuses the otherwise defective service.

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the orphan's court stated that it overruled the Parents' service objections, because the court had no doubt the Parents had actual knowledge of the hearing. The court noted that when Mother texted with Caseworker Herie immediately prior to the start of the hearing, Mother said she and Father would not attend because of internet issues and because of their dissatisfaction with their respective attorneys – the court explains that Mother never claimed she and Father lacked knowledge of the proceedings. **See** Orphans' Court Opinion (O.C.O.), 1/25/21, at 12; **see also** N.T., 10/13/20, at 21. Likewise, the court cites Caseworker Herie's testimony that when she met with Father to deliver bus passes, Father confirmed he had received the emailed petitions. **Id.**; **see also** N.T., at 80.

Indeed, our review of the record indicates it was during this testimony when the parties first realized that service might have been improper. Counsel for Mother immediately raised the issue. **See** N.T. at 92. The court directed the parties to be prepared to address the service question following the lunch

- 13 -

recess. When the hearing resumed, the Parents' respective attorneys joined in an oral motion to discontinue the hearing, arguing that the emailed petitions did not constitute strict compliance with the service procedures. *Id.* at 94-95.

In response, Attorney Michelle O'Brien, the solicitor for the Agency, stated:

> That all very well may be true. I don't have information that it was actually mailed. It was attempted to be hand delivered, is my understanding; however, it was not hand delivered because [the Parents] refused to meet with our caseworkers to deliver it.
>
> I do have, for what it's worth, and if you'd like to see them, text messages back and forth between [the Agency] caseworker and [Mother] stating – these are from – I don't have the date, but [the caseworker] has the date on her - - I don't have copies on the screen shots anyway, but [the caseworker] has copies on her phone and can tell us what date this happened.
>
> But I do have an email saying, I mailed you the paperwork, did you get it? [Mother] says, No. [The caseworker] says, Okay. I'm going to resend it. I resent it. And then [Mother] says, Okay.
>
> […]
>
> So, although service, according to the rules, was not - - I can't prove that that took place, I do have several sources that can state that [Mother and Father] were aware of the hearing today.

*Id.* at 95-96.

Caseworker Herie then reaffirmed she sent the petitions *via* email, and that when she met with Father the following week to give him bus passes,

Father indicated that he received the paperwork. *Id.* at 97. Caseworker Herie also stated that one of the Children's foster care workers witnessed the exchange. Counsel for Mother and the court discussed whether any of the judicial emergency orders superseded the Rules of Procedure. *Id.* at 98-99.

The court ultimately concluded:

> I'm familiar with [Rule 15.6] and – well, I – the service was definitely made and the parties definitely knew about it, but personal service with a copy of the petition, apparently, it doesn't sound like it was made.
>
> But I believe, under the current situation, Parents, there was some testimony the Parents, they could not get with the parties to serve them. So whatever that's worth, we'll proceed. Okay. [Counsel for Mother], I think you're cross examining.

*Id.* at 99.

On appeal, the Parents argue the Agency had to serve the petitions in strict accordance with the statute and rule. *See* Mother's Brief at 14; *see generally* Father's Brief at 13-18. Both Parents maintain it was irrelevant whether they possessed actual knowledge of the proceedings.[1] For support,

---

[1] We note that, while Mother does not explicitly challenge the court's finding that she had actual knowledge, Father does. He cites Caseworker Herie's testimony that she had never met Father, nor had his information, until after she emailed the petitions. Father also takes issue with the characterization that the emails were sent to the "family's email address," noting that the email address was in Mother's name. *See* Father's Brief at 15. Moreover, Father disputes Attorney O'Brien's representation that the parents had previously refused personal service. Notwithstanding these points, Father's ultimate argument is the same as Mother's – *i.e.*, that the Agency did not perfect
*(Footnote Continued Next Page)*

Mother analogizes the instant case to ***Interest of K.P.***, 199 A.3d 899, 901 (Pa. Super. 2018), which involves service under the Juvenile Act. Specifically, ***K.P.*** concerned whether a mother received proper notice of her child's dependency adjudication hearing, where the caseworker for the local children and youth services agency notified the mother of the hearing *via* Facebook Messenger. We held that the caseworker's method of service circumvented the pertinent Rules of Pennsylvania Juvenile Court Procedure and consequently violated the mother's right to due process. ***See generally K.P.***, 199 A.3d at 901-904. Thus, Mother argues here, if electronic service was defective in a dependency case, electronic service must be equally defective in a termination hearing, and that we must similarly conclude there was a due process violation. ***See*** Mother's Brief at 12.

By contrast, the Agency argues its use of electronic service did not amount to a due process violation for two reasons. First, the Agency maintains that, because of the statewide judicial emergency created by the Covid-19 pandemic, the Pennsylvania Supreme Court and the Lackawanna County Court of Common Pleas issued emergency orders authorizing the use of "advanced communication technologies," which included email.[2] ***See*** Agency's Brief at

---

service, because its use of email was a circumvention of the proper procedures.

[2] The Agency relies on the Pennsylvania Rule of Juvenile Court Procedure 1120, which specifies that "advanced communication technologies" consists of, *inter alia*, email.

16. Thus, the Agency concludes that the pandemic renders **K.P.** distinguishable from the instant matter. Second, the Agency argues there was no due process violation because the Parents had actual knowledge of the proceedings.

We begin our analysis with the Agency's first justification, that the judicial emergency orders relieved the Agency from its burden to strictly comply with notice procedures. Obviously, we cannot ignore the effect that the pandemic has had on the judiciary and those it serves. But contrary to the Agency's position, none of the emergency orders issued by the Lackawanna County Court of Common Pleas relaxed the notice procedures – procedures codified by the Legislature – to allow the Agency to unilaterally effectuate service *via* email. These orders primarily referenced "advanced communication technologies" as means to hold remote hearings, conferences, and the like. In fact, the original order declaring a judicial emergency, issued by our Supreme Court on March 16, 2020, specifies that local president judges shall have the ability "to authorize additional uses of advanced communication technology **to conduct court proceedings, subject to constitutional restrictions**[.]" **See** Supreme Court Order, 3/16/20, at ¶2(a) (emphasis added). As detailed above, procedures involving the termination of parental rights necessarily implicate the Fourteenth Amendment's due process guarantee. Thus, insofar as the judicial emergency orders even pertained to Agency business, the Agency's use of email was still subject to constitutional constraints. After all, a judicial emergency – whether it is the byproduct of

pandemic or some other calamity – is a reason why the rights of individuals must be safeguarded more, not less.

The Agency's second reason why we should overlook its method of service is because Parents had actual knowledge of the hearing. To the extent the Agency advances this argument to distinguish **K.P.**, the Agency has misread that case. In **K.P.**, the mother actually responded to caseworker's Facebook message informing her of the hearing; *i.e.*, the mother had actual knowledge of the same. **K.P.**, 199 A.3d at 900. In fact, in **K.P.**, the mother told the caseworker *via* Facebook that she would not attend the adjudicatory hearing for dubious logistical reasons. **Id.** Here, too, Mother and Father were reportedly aware of the termination hearing's date and time; and they also provided a logistical reason – poor internet – as to why they would not be in attendance. Yet, in **K.P.** we concluded that a parent's actual knowledge of the hearing does not remedy defective service noticing the same. Put plainly, making a parent aware of a hearing is not the same as affording the parent the necessary information – information mandated by law, in a manner specified by law – to defend in such a hearing.

Of course, we recognize Caseworker Herie testified that she emailed the "paperwork" (that is, the termination petitions) to the Parents – as opposed to simply informing them of the hearing's date and time. This matters not. For one, Caseworker Herie conceded there were problems with her emails, and that Mother said she **did not** receive Caseworker Herie's first email. **See,** N.T. at 95-96, 100-101. And, Caseworker Herie also acknowledged that, while

she asks for a "read receipt" on her emails, she did not have receipts for those emails serving the Parents. *Id.* at 101. But whether Caseworker Herie's email included the petitions is ultimately irrelevant.

As we stated above, the Agency "bears the burden to prove proper service by its affirmative act," and we will not allow the termination of parental rights "without strict compliance with the procedures set forth by the Legislature[.]" *A.N.P.*, 155 A.3d at 66; 68. Here, Caseworker Herie's averments did not meet that burden. The "affirmative act" the Agency had to take was the specified procedure, explicitly detailed in Section 2513(b) and Pa.O.C. Rule 15.6(a); that is, the Agency had to attempt to provide notice by personal service, service on a household member at the residence, or by registered/certified mail *before* the Agency could utilize the alternative service methods listed in Rule 15.6(a)(2). The Agency had to strictly comply with these provisions, but here the Agency did not.

We certainly cannot conclude, as the Agency argues, that service was proven by the fact that the Parents had previously refused to let the Agency caseworkers into their home. *See* Agency's Brief at 15. Service cannot be proven by such acts of omission or refusal. *See Leight*, 615 A.2d at 753. On this point, we must observe Father also disputes that he and Mother had even avoided service. Although Attorney O'Brien averred to her understanding that the Parents refused service, Father explains it was incomprehensible that the Agency did not take the opportunity to personally serve Father with the

termination petitions, when Father met with Caseworker Herie to collect the bus passes. **See** Father's Brief at 15-16.

Ultimately, we find Mother's reliance on **K.P.** to be appropriate. Although there are minor, albeit important, discrepancies between the Rules of Juvenile Court Procedure and the Rules of Orphans' Court Procedure, these discrepancies are immaterial for our purposes. Both Rules require a very specific type of service in the first instance. **See** Pa.R.J.C.P. No. 1263(a)(1)-(2); **see also** Pa.O.C. Rule 15.6(a). But electronic service, when there was no effort to first effectuate service by the enumerated methods, simply does not constitute strict compliance with the rules governing notice.

We are cognizant of the real-world difficulties that caseworkers face in their roles as protectors of the Commonwealth's children, and how their efforts may be stifled by "obstreperous"[3] or transient parents – to say nothing of the pandemic. However, such obstruction does not relieve the Agency of its obligation to strictly comply with proper procedure, nor does it lessen the Agency's burden to prove proper service by affirmative acts. **See A.N.P.**, **supra**. If anything, cases involving obstinate Parents and distressed children require closer attention to procedure, not less compliance. The Agency was required to make a good faith effort to serve notice to the Parents at their correct address. **See K.G.M.**, 845 A.2d at 864. Had the Agency made a good faith effort to serve the Parents at their residence and failed, **then** the Agency

---

[3] **See** O.C.O. at 12.

could have been armed with alternatives under Rule 15.6(a)(2). But no such effort was made. Service was defective. The Parents' constitutional right to due process was violated. And the orphans' court erred when it denied counsels' motion to discontinue the hearing.

In sum: the Agency's email to the Parents constituted defective service, where the Agency did not attempt service under Pa.O.C. Rule 15.6(a) and Section 2513(b) of the Adoption Act. Neither the judicial emergency orders, nor Parents' actual knowledge of the hearing, negates the Agency's circumvention of these procedures. Consequently, without proper service, the Parents' rights to due process were violated. The only remedy now is to vacate the termination orders and remand this case for a new hearing.

In light of our disposition, we do not reach the remaining appellate issues, which include serious evidentiary and substantive claims. We are aware of the alarming allegations of sexual abuse, neglect, and trauma alleged in this matter, and we are particularly mindful that K.H.D.'s difficult testimony was for naught. We also recognize, given our decision, that the necessary permanency to which these Children are entitled, which has thus far escaped them, will unfortunately now be delayed. Nonetheless, we cannot ignore the fundamental due process rights that were violated here. Upon remand, the orphans' court shall make efforts to hold a new termination hearing in an expeditious manner, in accordance with the proper rules and procedures, including Pa.O.C. Rule 15.6.

Orders vacated. Cases remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/19/2021</u>