J-A05018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1283 WDA 2024 |

Appeal from the Order Entered September 27, 2024
In the Court of Common Pleas of Greene County Orphans' Court at
No(s):  2024 OA 13

BEFORE:  MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED: MARCH 25, 2025**

Appellant, N.C. ("Father"), appeals from the order entered in the Greene County Court of Common Pleas, granting the petition of Appellees, Je.B. ("Mother") and Jo.B. ("Prospective Adoptive Father"), for involuntary termination of Father's parental rights to their minor child, L.S.C. ("Child"). We affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father are Child's birth parents.  Child was born in October 2017. Mother and Father married in 2018 and divorced in 2020.  Father has not seen Child since the summer of 2020.  Around that time, Mother obtained an order granting her legal and physical custody of Child.  Thereafter, Father was

_____

[*] Retired Senior Judge assigned to the Superior Court.

incarcerated for multiple periods. Currently, Father has been incarcerated since February 2023.

Mother married Prospective Adoptive Father in 2022. On April 4, 2024, Mother and Prospective Adoptive Father filed a petition seeking the involuntary termination of Father's parental rights. Prior to the termination hearing, Father requested counsel. The court appointed current counsel on July 24, 2024. On July 30, 2024, the parties appeared for the termination hearing. Before testimony commenced, Father requested a continuance for additional time to confer with counsel. The court denied Father's continuance request, but it permitted a brief recess so that Father and counsel would have additional time to discuss the matter. After approximately ten minutes, the court commenced the hearing. Mother and Father provided testimony, and the guardian *ad litem* ("GAL") made an on-the-record recommendation in favor of termination.

On September 27, 2024, the court issued its findings of fact and conclusions of law, as well as an order terminating Father's parental rights to Child. Specifically, the court found that termination was appropriate under 23 Pa.C.S.A. § 2511(a)(1) and (b). Father timely filed a notice of appeal and concise statement of matters complained of on appeal on October 21, 2024.

Father now raises three issues for our review.

> Whether the trial court erred in finding that [Appellees] had proven by clear and convincing evidence that [they] had established the statutory grounds for termination as alleged under 23 Pa.C.S. § 2511(a)(1).

Whether the trial court erred in finding that the termination of the father's parental rights was in the best interests of the child under 23 Pa.C.S. § 2511(b)

Whether the trial court erred in denying [Father's] motion for continuance prior to the commencement of the hearing on the petition for involuntary termination of parental rights when counsel for [Father] had only been appoint[ed] by order dated July 24, 2024 and counsel indicated to the court prior to the hearing that he had not been able to contact [Father] to prepare for the hearing on July 30, 2024 and thus, prejudicing his due process rights and his right to counsel in this matter.

(Father's Brief at 7).

In his first two issues, Father concedes that he has not had contact with Child during the six-month period set forth in Section 2511(a)(1). Father asserts, however, that he did not demonstrate a settled purpose of relinquishing his parental claim. Father insists that he tried to contact Child and develop a relationship, but "Mother put up roadblocks to his contact and visitation with the child thus making [Father's] efforts pointless." (*Id.* at 16). Father also blames his incarceration for his lack of contact with Child, and he maintains that incarceration alone is an insufficient basis for termination of parental rights.

With respect to Section 2511(b), Father elaborates on Mother's purported motivation for preventing him from bonding with Child:

Mother's ultimate motives in putting up these barriers should be scrutinized since she had recently married [Prospective Adoptive Father] in June 2022 … and they have obviously been looking at having her new husband adopt [Child] for some time. These roadblocks have prevented

- 3 -

[Father] from establishing a bond with the child. If [Father] was given a genuine and sincere opportunity to develop this bond, it would be in the child's best interests to have an ongoing relationship with his biological father.

(*Id.* at 19) (record citation omitted). Father concludes the court erred in terminating his parental rights pursuant to Section 2511(a)(1) and (b). We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294-95, 255 A.3d 343, 358-59 (2021) (internal citations and quotation marks omitted).

- 4 -

Appellees filed a petition for the involuntary termination of Father's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a)  General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*      \*      \*

**(b)  Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." ***In re I.J.***, 972 A.2d 5, 10 (Pa.Super. 2009).

Once the evidence establishes a failure to perform parental

duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted).

Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold."
*Interest of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting *In re E.A.P.*, 944 A.2d 79, 84 (Pa.Super. 2008)).

Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M., supra* at 855.

If the court determines that there are grounds to terminate parental rights under Section 2511(a), the court must "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010).

Additionally:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care…; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs. … Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific

- 7 -

needs.

***Interest of K.T.***, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023) (internal citations and footnotes omitted).

Instantly, the court heard from both Mother and Father. Mother testified that Father has not seen Child since June or July 2020. (***See*** N.T. Termination Hearing, 7/30/24, at 11). In August 2020, Father sent Mother a text message asking to meet with Child at a park. When Mother followed up, Father did not respond. Since then, Mother insisted that Father has not attempted to see or speak with Child.

Mother testified that the only item Father provided for Child was a pair of shoes, which he gifted in 2020. (***Id.*** at 13). Since June 2020, Father has not sent any cards or gifts. (***Id.***) During Father's periods of incarceration, Mother "would occasionally" receive a letter from Father. (***Id.*** at 23). These letters included "two sentences" inquiring about Child's well-being. (***Id.***) Most of the letters were devoted to Father "pleading his case that he was a changed man." (***Id.*** at 23-24). Father sent the last of these letters "[a]t least three/four years ago," and Mother never heard from Father after he was released from custody. (***Id.*** at 24).

Due to Father's minimal contact with Child, Mother claimed that Child would not recognize Father if they met on the street. (***Id.*** at 15). Child has never asked to see or call Father. Child believes Prospective Adoptive Father is his father. Prospective Adoptive Father has been a part of Child's life since

Child was two years old. Mother described the relationship between Prospective Adoptive Father and Child as the "same as any other son and dad[.]" (**Id.** at 16). Prospective Adoptive Father "takes care of [Child], he gets him to his practices, his wrestling. He teaches [Child] right from wrong." (**Id.**)

During Father's testimony, he acknowledged that he has not seen Child since the summer of 2020. (**Id.** at 27). Father also agreed that he had sent approximately five letters to Mother during his periods of incarceration. Nevertheless, Father disputed Mother's claim that he had not attempted to contact Child since 2020. Father testified that he would call Mother's cell phone while he was in halfway houses from 2020 through 2022. Mother would "put [Child] on video … sometimes" during these calls. (**Id.** at 28). Father claimed that he "called all the way up to the end of 2022 before [he] went back for a violation." (**Id.**)

Father also asserted that he sent a letter to Mother after his most recent incarceration in February 2023, and he informed Mother that he "could slowly get back into [Child's] life or whatever." (**Id.** at 29). Subsequently, Father did not attempt to contact Child. (**Id.** at 30). Again, Father blamed Mother for the lack of communication: "We had an agreement that she doesn't want me talking to him while I'm in jail. We'd made that one prior." (**Id.**) As part of this agreement, Mother refused to bring Child to the jail. (**Id.** at 33).

During his current incarceration, Father admitted that he has not sought

out parenting programs. Regarding third-party contact with Child, Father was aware of this communication option. Nevertheless, Father provided an excuse for not utilizing this option: "I didn't know if I needed an attorney, I didn't have money for an attorney, and don't know how to file the paperwork." (*Id.* at 31). Likewise, Father has never brought an action seeking custody of Child. (*Id.* at 37-38).

The close of Father's cross-examination proved an apt summary of his circumstances:

> [APPELLEES' COUNSEL:] Would you agree that you put very minimal effort into maintaining a relationship with your son?
>
> [FATHER:] I believe, yes. I believe … I haven't been the greatest father, I do, yes.
>
> [APPELLEES' COUNSEL:] And is it possible that you will be spending the next six years in prison?
>
> [FATHER:] It's a possibility.
>
> [APPELLEES' COUNSEL:] And do you believe it is fair to [Child] to go that long without a father figure in his life?
>
> [FATHER:] Doesn't have to not be in his life.
>
> [APPELLEES' COUNSEL:] Okay. Well, you haven't been in his life for the past four years; is that correct?
>
> [FATHER:] Cause they won't let me.

(*Id.* at 36).

The court subsequently received an on-the-record recommendation from the GAL, who argued that termination of Father's parental rights was in

Child's best interests. The GAL emphasized that Child has no bond with Father, and Child is unaware of his biological father's identity. The GAL noted that Child "is thriving and happy" with Mother and Prospective Adoptive Father, "who has been a father to him[.]" (***Id.*** at 41). The GAL concluded that Child's best interests are served by keeping him in this "stable and loving environment." (***Id.***)

On this record, the court made the following legal conclusions:

> The court finds that termination has been proven by clear and convincing evidence as to at least 23 Pa.C.S. § 2511(a)(1).
>
> Next, the court considers how termination of the parent's rights would affect the needs and welfare of the child and the child's best interests.
>
> The best interest of Child is clearly to remain in his current home and be raised by his mother and her husband, and outside the care of Father. This provides a permanency that this child deserves and provides a stability and consistency that Father has not been able to provide, will not be able to provide any time in the near future, and has in fact forfeited. In addition, Child has little to no bond to Father.
>
> The court concludes that it would be in the child's best interest, and serve his needs and welfare, to have the parental rights of Father terminated.

(Conclusions of Law, filed 9/27/24, at ¶12). We accept this decision, which is supported by competent evidence. ***See In re Adoption of C.M., supra***.

With respect to Section 2511(a)(1), the court correctly determined that Father failed to perform parental rights for at least six months prior to the filing of the termination petition. ***See In re I.J., supra***. Father admitted he

has not seen Child since the summer of 2020, and Father's efforts at parenting have been almost nonexistent. Regarding Section 2511(b), the court correctly concluded that terminating Father's parental rights would not destroy an existing, necessary, and beneficial relationship for Child. **See In re Z.P., supra**. Based upon the foregoing, we cannot say that the court erred in terminating Father's parental rights. **See Adoption of C.M., supra**.

In his final issue, Father contends the court did not appoint his attorney until the week before the termination hearing. Father asserts that his attorney requested a continuance of the termination hearing "so that he could communicate with [Father] and prepare any potential defenses," but the court denied the continuance request. (Father's Brief at 20). Father insists that the denial of the continuance request "was manifestly unreasonable because it deprived him of his due process rights under the law." (**Id.** at 23). Specifically, Father complains that he did not have the ability to discuss the case with counsel and adequately prepare a defense for the hearing. Father concludes that we must reverse the termination order on this basis. We disagree.

In termination cases, the following principles govern continuance requests:

> The matter of granting or denying a continuance is within the discretion of the trial court. Appellate courts will not disturb a trial court's determination absent an abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that

the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will.

*In Interest of D.F.*, 165 A.3d 960, 964-65 (Pa.Super. 2017), *appeal denied*, 642 Pa. 460, 170 A.3d 991 (2017) (internal citations and quotation marks omitted).

"Among the oldest of 'fundamental liberty interests' recognized by the Constitution is a parent's right to make decisions concerning the care, custody, and control of his or her children." *In re Adoption of K.M.D.*, 261 A.3d 1055, 1059 (Pa.Super. 2021).

> Naturally then, it is well-settled that any individual whose parental rights are to be terminated must be afforded due process—that is, certain procedural safeguards. Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter. Although we have explained that due process is flexible and calls for such procedural protections as the situation demands, we are unwilling to allow the termination of parental rights without **strict compliance** with the procedures set forth by the Legislature….

*Id.* (internal citations and quotation marks omitted) (emphasis in original).

Instantly, the court originally scheduled the termination hearing for May 14, 2024. (*See* Order, filed 4/15/24). Appellees subsequently filed a petition asking the court to permit Father to testify by telephone or advanced communication device. The court granted this petition and continued the hearing until June 18, 2024. (*See* Order, filed 5/9/24). Despite the scheduling of the hearing, Appellees had yet to serve Father with the termination petition. Consequently, the court again continued the hearing

until July 30, 2024.  (*See* Order, filed 6/24/24).

Appellees eventually served the termination petition.  On July 12, 2024, Father responded by filing a *pro se* petition seeking appointed counsel.  The court granted Father's petition and appointed counsel on July 24, 2024.  On July 30, 2024, the termination hearing proceeded as scheduled.  At the start of the hearing, however, Father's counsel requested a continuance "so that [Father] and [counsel] can have some meaningful discussion about his case and about preparation for a hearing."  (N.T. Termination Hearing at 3). Appellees' counsel opposed this request and stated:

> [W]hile I can certainly empathize with opposing counsel, my clients have—you know, this has been delayed and we're delaying permanency for this child.  I don't know what type of defense Father would … come up with … seeing as the allegations are he has had zero contact with his child since 2020.  We're going on nearly four years here.  So, we would vehemently object to this being continued once again.

(*Id.* at 3-4)

The court considered the arguments from both parties before denying Father's request:

> You know, I know that this has been difficult to schedule with SCI.  I also—I'm sympathetic to that.  I'm sympathetic to both your positions, actually.  [Appellees are] prejudiced by the fact that you're here again.  You've waited.  [Father's counsel is] prejudiced by the fact that you found out a few days ago, at the most, that you were appointed to represent him.
>
> I have no idea what [Father's] defense will be….  I mean, the best that I can do—[Father's counsel] does not make these requests without merit, generally, and I think there probably is some merit to it.  I can—if [Father] and [his

counsel] want to, we'll—we'll delay until 3:30, but I want to get this on the record today....

\* \* \*

I mean, I'm guessing that it's going to be some kind of defense regarding Mother and Stepdad putting roadblocks up, or something of that nature. I don't know. We'll give you some more time to discuss, but we need to start no later than 3:30. So, the request for a continuance is denied, but if you would like the time, we can give you the time.

(*Id.* at 4-6). At that point, the judge cleared the courtroom so that Father and counsel could discuss the case in private. The court remained in recess for approximately ten minutes before going back on the record.

Here, the court recognized the merit of Father's request for additional time to consult with counsel. The court, however, remained mindful of the fact that further delay would prevent Child from achieving permanency. Because the court's denial of the continuance request effectively served Child's best interests in this regard, we disagree with Father's conclusion that the ruling was manifestly unreasonable. ***See Interest of D.F., supra***. To the extent Father also argues that the court deprived him of due process, we reiterate that due process requires adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter. ***See Adoption of K.M.D., supra***. Our review of the record reveals no due process violations. Moreover, the termination hearing transcript demonstrates that Father had ample opportunity to advance his arguments regarding Mother's alleged interference in Father's relationship

with Child. (***See*** N.T. Termination Hearing at 25-38). Consequently, Father is not entitled to relief on his final claim, and we affirm the order for involuntary termination of Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/25/2025