J-S12002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2410 EDA 2021 |

Appeal from the Decree Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000276-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C.B., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2411 EDA 2021 |

Appeal from the Decree Entered October 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000277-2021

BEFORE:  BENDER, P.J.E., BOWES, J., and DUBOW, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 6, 2022**

S.B. ("Father") appeals from the decrees entered on October 27, 2021, granting the petitions filed by the Department of Human Services ("DHS" or the "Agency") to involuntarily terminate his parental rights to his minor son, S.C.B., Jr. (born in May of 2013), and his minor daughter, A.G.B. (born in October of 2017) (collectively "Children"), pursuant to sections 2511(a)(1),

(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1, 2]  After

careful review, we affirm.

The trial court provided the following summary of the relevant facts and

procedural history in its Pa.R.A.P. 1925(a) opinion:

> This family became involved with [DHS] due to concerns regarding
> the safety and welfare of both Children.[3]
>
> On August 1, 2017, DHS received a General Protective Services
> (GPS) report alleging that … Mother was evicted from her home
> [on July 15, 2017], because she owed $8,000.00 in rental
> payments, and that she was residing with … Children in the home
> of a family friend, which was not appropriate for … Children; that
> the drop ceiling in the home was missing; that the ceiling in the
> kitchen had a large hole; that the downstairs electric outlets were
> inoperable and there were extension cords running to the living
> room for electricity; that there was no banister on the stairs; that
> the door to Mother's bedroom had been removed from its hinges;
> that multiple individuals visited the home; and that there was
> minimal food in the home.[4]  The report also alleged that Mother
> had not received sufficient prenatal care; that Mother admitted
> taking Adderall that she purchased illegally; that Mother had
> participated in a Suboxone program but sold the Suboxone to
> others; and that Mother stated that she was informed by her
> physician that she needed to gain weight and should continue
> taking her Suboxone.  The report further alleged that … Mother

---

[1] This Court *sua sponte* consolidated the appeals at Nos. 2410 and 2411 EDA 2021, as the matters involve related parties and issues.  **See** *Per Curiam* Order, 12/22/21 (single page); Pa.R.A.P. 513.

[2] The parental rights of T.C. ("Mother") were also involuntarily terminated by separate decrees on the same date.  Mother has not filed appeals.

[3] At the time, Children's older sibling, A.R., also resided with Mother.  DHS located A.R.'s biological father, T.R., Jr., and placed A.R. in his father's care. Trial Court Opinion ("TCO"), 1/25/22, at 3-4.

[4] Father did not reside with Mother.  **See** DHS's Brief at 5.

suffers from depression and that she failed to attend an intake appointment scheduled at Community Organization for Mental Health and Retardation (COMHAR). This report was determined to be valid.

… DHS visited [Mother and Children] at the family friend's home. DHS confirmed the allegations of the report. DHS observed that there were also two large dogs, three unidentified adult males and one unidentified adult female in the home. DHS also observed drug paraphernalia in the home's trash receptacle. Mother informed DHS that she was depressed and had stopped taking her prescribed Suboxone for 47 days. Mother admitted that she had taken one Adderall which she had obtained without a prescription….

On August 1, 2017, DHS located … S.C.B.[,] Jr.'s paternal great aunt and uncle, A.B. and J.B., who agreed to care for [him]. DHS implemented a safety plan [in their] home…. On September 27, 2017, [the Community Umbrella Agency (CUA)] held an initial single case plan (SCP) for [S.C.B., Jr.] The primary goal for … [him] was identified as reunification, with a concurrent goal of adoption. The objectives identified for Father were: 1) to submit [the Clinical Evaluation Unit (CEU)] dual diagnosis assessment; 2) to follow CEU recommendations; 3) to complete three random drug screens; 4) to communicate with CUA in regard[] to obtaining suitable housing; 5) to allow CUA to perform a walk[-]through after obtaining suitable housing; and 6) to have supervised visitation as per court order. Mother and Father did not attend.

[I]n October [of] 2017, DHS received a GPS report alleging that Mother gave birth to A.G.B. [that month] at Temple University Hospital …; that the infant was born full-term, weighing 4 pounds and 13 ounces, and had Appearance, Pulse, Grimace, Activity and Respiration (APGAR) scores of 9 and 9; and that Mother did not receive prenatal care until she was 28 weeks pregnant. The report also alleged that Mother has a history of depression and anxiety; that Mother tested positive for marijuana in May of 2017; that she tested positive for amphetamines in the past; that Mother was abusing … A.R.'s Adderall prescription pills; that Mother was currently receiving drug treatment services through North East Treatment (NET) Center; and that Mother reported that she is prepared to care for A.G.B. The report alleged that Mother was evicted from a home and does not have stable, appropriate housing[,] and that the infant's siblings are residing with relatives.

On October 5, 2017, DHS learned that Mother was residing in a halfway house and that Father … had admitted using marijuana regularly and that he did not have stable housing and was currently on probation…. On October 6, 2017, DHS spoke with Father, who identified a family friend, D.M., as a possible placement resource for A.G.B. [That same day], DHS obtained an [order of protective custody (OPC)] for A.G.B. and placed her in the home of D.M. On October 9, 2017, a shelter care hearing for A.G.B. was held before Juvenile Court Hearing Officer Betsy Wahl. The OPC was lifted and [the court] ordered … the temporary commitment to DHS to stand…. Mother and Father [were] to have supervised visits twice a week at the [A]gency for 2 hours…. Father did not attend [the] hearing[].

On November 7, 2017[,] adjudicatory hearings were held for both Children before the Honorable Daine Grey, Jr.[5] Legal custody [was] transferred to DHS and placement [was] in kinship care. Mother and Father [were] to have supervised visits with [Children] at the [A]gency twice per week for 2 hours. Visits [were] to be separate and [could] be modified by agreement of the child advocate. Sibling visits [were] to occur…. [The court determined that] Father [was] … on probation and [did] not … have appropriate housing for reunification. Mother and Father [were] referred to … [CEU] for forthwith drug and alcohol screens, dual diagnosis assessments and monitoring and 3 randoms prior to [the] next court date. [Mother and Father were] to sign all release[s] and consents. [They were] referred to ARC for parenting and housing. Children [were reported] safe as of [October 9, 2017]. Father did attend [the] hearings.

TCO at 3-7 (unnecessary capitalization, citations to record, and some paragraph breaks omitted).

The record reflects that Children were placed in foster care with "Maternal Cousin" in February of 2018 and have remained in that home ever since. *See id.* at 18; N.T. Hearing at 10. Permanency review hearings were

_____

[5] The court adjudicated Children dependents based on abuse, neglect, or dependency. *See* Petition for Involuntary Termination of Parental Rights, 5/13/21, at Exhibit A ¶q ("Statement of Facts").

held on February 6, 2018, May 8, 2018, and August 7, 2018, before Juvenile Hearing Officer Baxter J. Macon. *Id.* at 7-8. At each hearing, it was determined that legal custody remained with DHS and that placement continued in kinship foster care for Children. Father attended each of these hearings and was granted weekly, supervised visits. *Id.* Mother and Father were both referred to CEU for drug screens and assessment and were required to submit random drug screens prior to each court date. *Id.* Father was referred to ARC for parenting classes. *Id.* at 8.

On September 11, 2018, CUA NET held a revised SCP for both Children. The primary goal for Children was identified as reunification, with a concurrent goal of adoption. *Id.* at 9. The objectives identified for Father were:

> 1) to follow CEU recommendations; 2) [to] complete three random drug screens; 3) [to] attend a drug and alcohol treatment program and adhere to all recommendations and successfully complete [the] program; … 5) to complete three random drug screens; 6) to communicate with CUA in regard[] to obtaining housing; 7) [to] schedule and complete CEU assessment as per court order and adhere to all recommendations; 8) to allow CUA to perform [a] walk[-]through after obtaining suitable housing; … 9) to participate with ARC for housing; 10) to have supervised visits weekly at the Agency; 11) [to] maintain all visits with Children and confirm visits 24 hours in advance; 12) [to] attend ARC for parenting classes or explore alternate parenting classes; 13) [to] provide [his] current work schedule to CUA; and 14) [to] provide [a] lease or mortgage of stable independent housing. Mother and Father failed to attend.

*Id.* (citation to record omitted).

Permanency review hearings were held again, approximately every three months, which Father attended through October 2019. In February of

- 5 -

2019, Children were found to be developmentally on target and to be doing well in their foster home. Statement of Facts at ¶w. Father only missed two of his weekly, supervised visits due to scheduling issues. *Id.* His visits were going well and were modified to community, supervised visits. *Id.* At the October 15, 2019 hearing, it was determined that Father was consistent with visitation and that he had obtained appropriate housing. TCO at 11. Visitation was modified, granting Father supervised, weekend visits with Children. *Id.* The permanency hearing scheduled for January 7, 2020, was continued to February 25, 2020, as Father was incarcerated, and Mother was unavailable. Statement of Facts at ¶aa. At the February 2020 hearing, the court was informed that Father was released from prison; however, Father did not attend that hearing. TCO at 11.

Additionally, the trial court stated:

On July 24, 2020, CUA NET held a revised SCP for … Children. The primary goal for … Children was identified as adoption, with a concurrent goal of permanent legal custody (PLC). The objectives identified for Father were: 1) to complete three random drug screens; 2) [to] attend a drug and alcohol treatment program and adhere to all recommendations and successfully complete [the] program; 3) to complete forthwith CEU assessment and adhere to recommendations following his release from prison; 4) to report for random drug screens when contacted following his release from prison; 5) [to] maintain all visits with [C]hildren and confirm visits 24 hours in advance; 6) [to] attend ARC for parenting classes or explore alternate parenting classes; [and] 7) due to recent events[,] Father will abide by [the] recent protection from abuse (PFA) and/or restraining order until otherwise directed by the court. [Mother and Father] failed to attend.

Permanency hearings were held for … Children on September 1, 2020, before the Honorable Allan L. Tereshko.[6]  Legal custody remain[ed] with DHS and placement [in kinship foster care] continue[d].  S.C.B., Jr., [was] up to date with medical and dental.  A.G.B. [was] up to date with medical, but dental need[ed] to be scheduled.  CUA [was] to follow through with Ages and Stages for her.  Visitation with Father[,] once he is released from prison[,] shall be bi-weekly[,] supervised [visits] at the [A]gency.  [Mother and Father were] referred to CEU for screens and randoms….  [They were] to complete domestic violence counseling[, and a voluntary relinquishment of parental rights (VOLS) was] to be explored with [them].  Children [were] safe as of [August 3, 2020].  Father did not attend [the] hearings.

*Id.* at 11-12 (citations to record and unnecessary capitalization omitted).

At a permanency hearing on January 19, 2021, the court found the whereabouts of Father to be unknown.  Statement of Facts at ¶ff.  The court ordered that Children were to remain committed and placed, and that Father be referred to CEU for forthwith drug and alcohol screens when he availed himself.  *Id.*  On April 4, 2021, CUA held a revised SCP for Children.  The primary goal for Children was identified as adoption, with a concurrent goal of PLC.  TCO at 13.  The objectives for Father remained the same.  *Id.*  Father was not in attendance at this meeting.  *Id.*

On June 1, 2021, a permanency hearing was held, at which legal custody was ordered to remain with DHS and Children's placement was to remain status quo.  *Id.*  Children were both up to date on their medical and dental care.  S.C.B., Jr., was attending second grade in the Upper Moreland School and was receiving therapy at CFAR.  A.G.B. was developmentally on target

_____

[6] Father was again reportedly incarcerated.  *See* DHS's Brief at 6.

and not in need of services. *Id.* Father was incarcerated. After finding that Father had not complied with his objectives, the court ordered him to comply and to make contact with CUA. *Id.* The court observed that Father was convicted of drug-related offenses on August 8, 2002, February 8, 2007, November 20, 2015, and July 31, 2017. *Id.*[7]

On May 13, 2021, DHS filed petitions for involuntary termination of both Mother's and Father's parental rights to both Children, as well as goal change petitions. A joint hearing was originally scheduled for September 15, 2021, and was continued to October 27, 2021, due to Mother's counsel's failure to appear. Father was represented by counsel at the continued hearing; however, Father was not in attendance. Children's best interests were represented by a guardian *ad litem* ("GAL"), and separate legal counsel was appointed to represent their legal interests. At the conclusion of the hearing, the trial court found clear and convincing evidence to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and to change Children's goal from reunification to adoption.

On November 24, 2021, Father filed timely notices of appeal from the termination decrees, along with concise statements of errors complained of

_____

[7] DHS notes that, in addition to his drug-related convictions, Father was convicted of reckless endangerment of another person in 2014, unauthorized use of a motor vehicle, simple assault, and terroristic threats in 2016. DHS's Brief at 6-7. DHS further reports that Father was arrested on May 10, 2021, charged with aggravated assault, conspiracy, simple assault, and strangulation, and was awaiting trial at the time of the termination hearing. *Id.* at 7.

- 8 -

on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). Father now presents the following questions for our review:

A. Whether the trial court committed reversible error and abused its discretion when it overruled [F]ather's objection, where DHS did not properly serve [F]ather with notice of the hearing and goal change petitions [and, t]hus[, F]ather's right to due process was violated by the trial court[?]

B. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 Pa.C.S.[] § 2511(a)(1), (a)(2), (a)(5), and (a)(8)[,] as [F]ather made progress towards working [*sic*] and meeting [his] FSP goals?

C. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of [Children,] as required by the Adoption Act[,] 23 Pa.C.S.[] § 2511(b)?

Father's Brief at 2.

In his first issue, Father "presents a question of law requiring us to interpret the notice requirements of the Adoption Act and our Rules of Orphan Court Procedure. Thus, our standard of review is *de novo* and our scope of review is plenary." ***In re Adoption of K.M.D.***, 261 A.3d 1055, 1059 (Pa. Super. 2021) (citation omitted). We are further guided by the following principles:

The "termination of parental rights implicates a parent's Fourteenth Amendment right to due process." ***In Interest of A.N.P.***, 155 A.3d 55, 66 (Pa. Super. 2017) (citation omitted). "Due process requires [nothing more than] adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." ***Id.*** (citation and some punctuation omitted). Although "due process

is flexible and calls for such procedural protections as the situation demands," this Court is "unwilling to allow the termination of parental rights … without strict compliance with the procedures set forth by the Legislature." *Id.*[] at 66, 68 (citations and some punctuation omitted). "As in all civil cases, the petitioner … bears the burden to prove proper service by its affirmative acts." *In re K.B.*, 763 A.2d 436, 439 (Pa. Super. 2000) (citation omitted).

*In re M.N.K.*, 268 A.3d 492, 495 (Pa. Super. 2022) (some brackets omitted).

The Adoption Act addresses the notice requirement in matters concerning the involuntary termination of parental rights and the manner in which that notice shall be served:

**§ 2513.  Hearing**

**(a)**   **Time.**—The court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for involuntary termination) which shall be not less than ten days after filing of the petition.

**(b)**   **Notice.**—At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require….

23 Pa.C.S. § 2513(a)-(b).

Moreover, Pennsylvania Orphans' Court Rule 15.4 provides that notice of the hearing on a petition for involuntarily termination of parental rights shall be given in accordance with Rule 15.6.  Pa.O.C.R. 15.4(d).  Rule 15.6 provides, in relevant part:

**Rule 15.6.  Notice to Persons; Method; Notice of Orphans' Court Proceedings Filed on Dependency Docket**

(a)   Notice to every person to be notified shall be by personal service, service at his or her residence on an adult member of the household, or by registered or certified mail to his or her last known address….

Pa.O.C.R. 15.6(a).

Instantly, Father claims that the trial court erred in finding he was properly served with notice of the October 27, 2021 termination hearing, which deprived him of his right to due process. Father's Brief at 4. DHS presented evidence that notice of the hearing was delivered to the front desk at the Curran-Fromhold Correction Facility ("CFCF"), where Father was incarcerated, on October 25, 2021, via UPS Next Day service. *See* N.T. Hearing, 10/27/21, at 6-7; Exhibit DHS-1. Father argues that delivery by UPS was an improper method of service and that the notice was untimely, as it was received only two days prior to the hearing, rather than at least ten days as required by Section 2513 of the Adoption Act and by the Pennsylvania Orphans' Court Rules. Father's Brief at 4-6 (citing 23 Pa.C.S. § 2513(b); Pa.O.C.R. 15.4(d), 15.6). Moreover, he avers that DHS improperly served him with the goal change petitions via UPS service. *Id.* at 6 (citing Pa.O.C.R. 15.6 (requiring personal service or service by registered or certified mail)). In sum, Father claims that DHS failed to establish a good faith effort to notify him of the termination hearing and that the trial court failed to provide him with "fundamentally fair procedures" when it overruled his objection to the method and timeliness of service at the hearing. *Id.* at 6-8 (citing N.T. Hearing at 7; *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the

State…. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.")).

First, to the extent that Father alleges improper service of the goal change petitions, we note that Father appealed from the decrees terminating his parental rights – **not** from the orders granting DHS's requests for a goal change. Thus, he has waived any claim pertaining to the service of the goal change petitions. **See** Pa.R.A.P. 903(a) (requiring the filing of a notice of appeal within 30 days after the entry of the order from which the appeal is taken); **Porter v. Nikita Lodging, Inc.**, ___ A.3d 2022___, PA Super 78, *8-9 (filed May 2, 2022) (concluding that the failure to timely appeal from an order results in waiver of any issues related to that order, as this Court lacks jurisdiction to consider such issues).

Additionally, the argument section of Father's brief is void of any objection pertaining to the service of the petitions to involuntarily terminate his parental rights to Children, nor is such an issue raised in his "Statement of Questions Presented." Thus, we deem any claim regarding the timeliness and/or manner of service of the termination petitions to be waived. **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); **Commonwealth v. Long**, 786 A.2d 237, 239 n.3 (Pa. Super. 2001) ("Generally, questions not presented in the 'Statement of Questions Involved' are deemed waived.") (citation omitted). Even if we were to consider that a claim regarding the method of service of the termination petitions may be

suggested by Father's first question, we would deem this issue waived for failure to develop the argument. "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002). *See also* Pa.R.A.P. 2119(a). "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived." *Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa. Super. 2014) (citation omitted). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." *Id.* Hence, our analysis will focus on whether Father was properly served with notice of the termination hearing, which is the crux of his argument.

Notably, while Father alleges the trial court erred in finding that DHS properly served him with notice of the termination hearing, he does **not** contest the notice of the **originally scheduled** termination hearing held on September 15, 2021. Rather, his argument focuses solely on the notice given regarding the **continued** hearing on October 27, 2021. Accordingly, we conclude that the service provisions outlined in Section 2513 of the Adoption Act and in Pennsylvania Orphans' Court Rules 15.4 and 15.6 are not implicated in this matter. These provisions apply only to notice of the hearing scheduled upon the original filing of the petition. *See In re Adoption of J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005) (concluding that service of the original petition for involuntary termination of parental rights, which invokes the trial

court's jurisdiction over the matter, is sufficient to put a parent on notice of his rights even when an amended petition is later filed). Instead, we conclude that the Pennsylvania Rules of Civil Procedure imposed a duty on the prothonotary to provide notice of the continued hearing. *See* Pa.R.C.P. 236(a)(2) (providing that the prothonotary shall immediately give written notice of an order to each party's attorney of record or, if unrepresented, to each party). *See also* Pa.R.C.P. 236, Note (explaining that except in certain circumstances unrelated to this matter, Rule 236 does not prescribe a particular method of giving notice).

Instantly, the trial court found that DHS properly served Father with the original involuntary termination petitions and notice of the September 15, 2021 hearing, on June 8, 2021, more than three months in advance of the hearing date. TCO at 16. *See also* 23 Pa.C.S. §2513(b) (requiring at least ten days' notice); Exhibit DHS-1 (providing proof of delivery at CFCF on June 8, 2021, via UPS Next Day service). Moreover, counsel for Father was present at the September 15, 2021 hearing when the trial court announced the October 27, 2021 continued hearing date. *Id.* The docket also indicates that Father's counsel was served electronically with the continuance order on September 15, 2021, in accordance with Rule 236. Additionally, Father has failed to provide any evidence that he notified the court of his desire to participate in the October 27, 2021 hearing. *See In re Adoption of J.N.F.*, 887 A.2d. at 781 (noting that it is the burden of the incarcerated parent to notify the trial court if he desires to participate in a termination hearing).

- 14 -

Having determined that Father's counsel was properly given notice of the continued hearing date, and that Father was represented by counsel at the October 27, 2021 hearing, we reject Father's argument that the trial court violated his right to due process. *See In Interest of A.N.P.*, 155 A.3d at 66 ("Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter.").

Next, we address Father's claims regarding the involuntary termination of his parental rights to Children under sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. We review a decree terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. *In re Adoption of T.B.B.*,

835 A.2d 387, 394 (Pa. Super. 2003).

We are further guided by the following: Termination of parental rights

is governed by section 2511 of the Adoption Act, which requires a bifurcated

analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511,

other citations omitted). The burden is upon the petitioner to prove by clear

and convincing evidence that the asserted grounds for seeking the termination

of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the trial court terminated Father's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we analyze the court's decision to terminate under section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***

- 17 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(1).

To satisfy [s]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). In *C.M.S.*, we further acknowledge the following statement by our Supreme Court:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

- 18 -

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

In the case of an incarcerated parent, this Court has stated:

[T]he fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children…. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of his … potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations and quotation marks omitted). "Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010).

Here, Father claims that the trial court erred in terminating his parental rights under section 2511(a)(1); however, he fails to develop this argument. Father merely provides a bald statement that he "has ***not*** for a period of at

- 19 -

least six months immediately preceding the filing of the petition evidenced a settled purpose of relinquishing [his] parental claim or failed to perform parental duties." Father's Brief at 8 (emphasis added). This statement is not followed by any meaningful discussion or analysis. Thus, we deem Father's claim regarding the trial court's findings under section 2511(a)(1) to be waived. **See** Pa.R.A.P. 2119(b); **Estate of Haiko**, 799 A.2d at 161 ("Without a reasoned discussion of the law … our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for [the appellant].").

Nevertheless, even if this issue had not been waived, we would conclude that Father's claim pertaining to section 2511(a)(1) is meritless. While the record indicates that he had made some progress early on toward his SCP goals,[8] Father has not attended a hearing since October 15, 2019. "Thereafter, Father became incarcerated and did not comply with SCP objectives." TCO at 21. Moreover, the trial court determined that "no evidence was presented that [Father] utilized resources at his command while in prison to continue and/or pursue a close relationship with … Children." **Id.** **See also id.** at 20 (noting the testimony of CUA case worker, Alexis Adams, that Father has not called to speak to Children, nor has he sent them any letters or birthday gifts); **id.** at 19 (referencing Ms. Adams's testimony that

_____

[8] **See** TCO at 11 (noting that Father was consistent with visitation and had obtained appropriate housing at the time of the October 15, 2019 permanency hearing).

she has tried to contact Father at CFCF by mail, but that he has never responded to any of her correspondence).  Based on the foregoing, we would agree with the trial court that "[t]he evidence is clear and convincing and uncontradicted that Father abandoned these Children." *Id.* at 21.

Finally, Father's "Statement of Questions Presented" includes the issue of whether the trial court erred in terminating his parental rights under section 2511(b), but Father appears to abandon this claim in his brief.  Pennsylvania Rule of Appellate Procedure 2119 provides that the argument section of an appellate brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a).  "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived."  *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) (citation omitted).

Here, Father fails to include a separate argument section in his brief regarding his claim under section 2511(b).  In fact, the only portion of his argument that could even be construed as relating to this subsection is a single paragraph at the end of his argument pertaining to section 2511(a), in which Father merely repeats his assertion that he was not afforded an opportunity to be heard because DHS failed to effectuate service on him, and avers that he was "actively endeavoring to reunify with his [C]hildren."  Father's Brief at

9-10 (referencing the trial court's findings that visits with Children were going well in 2019). However, there is no reference whatsoever to the "best interests of Children" or to subsection 2511(b) in the body of the argument. Hence, we deem this issue waived due to Father's failure to develop his argument. *See Estate of Haiko*, *supra*.

Regardless, we would conclude that Father's claim regarding the trial court's findings under section 2511(b) is meritless. As the trial court opined:

> These Children have been in placement for about four years, and it is about what is best for them going forward. The evidence is clear and convincing and uncontradicted that Father abandoned these Children. Father had some involvement in the early parts of the case[,] and there is no evidence presented that the Children have a relationship []or a bond with Father. The testimony showed that S.C.B., Jr., would not even recognize Father if he saw him. A.G.B.[] has never been in Father's care[,] nor has any evidence been presented that she is aware of who her [f]ather is. Father has failed to remedy any of the issues that brought these Children into [c]ourt, and these Children's lives cannot be placed on hold in the hope that Father will summon the ability to handle the responsibilities of parenting.

TCO at 21.

Additionally, DHS stated that Children "deserve safety, stability, and permanency." DHS's Brief at 24. DHS argues that there is no "unique and irreplaceable" relationship between Father and Children and that Children have mostly grown up without him. *Id.* at 23-24 (citing *In re J.W.*, 578 A.2d 952, 958 (Pa. Super. 1990) (recognizing that a child's bond with his parent is "unique and irreplaceable" where the parent has nurtured the relationship, providing for the child's basic, physical needs, as well as his emotional

development)). Maternal Cousin meets all of Children's daily needs. *Id.* at 24. They have been placed with her since February of 2018. Father is not present in their lives. *Id.* Thus, terminating Father's parental rights will not cause Children to suffer irreparable harm and will free them for future adoption. *Id.*

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Children's needs and welfare, and the absence of any bond with Father, we would conclude that the court did not abuse its discretion in terminating Father's parental rights under section 2511(b). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (stating that appellate courts must defer to the trial court regarding credibility determinations and weight assessments, so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion).

Accordingly, we affirm the decrees terminating Father's parental rights to Children, pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decrees affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/6/2022</u>