J-A25020-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1490 WDA 2022 |

Appeal from the Order Entered November 23, 2022
In the Court of Common Pleas of Erie County Juvenile Division at No(s):
No. 151 of 2022

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF M.L.J. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.R.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 461 WDA 2023 |

Appeal from the Decree Entered March 21, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2C AD 2023

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: February 9, 2024**

In this consolidated matter, A.R.J. (Father) appeals from the decision of Erie County Court of Common Pleas (the juvenile court) to change the permanency goal of the dependency proceedings involving his one-year-old son, M.J. (the Child).  **See** 1490 WDA 2022.  Specifically, the juvenile court

---

[*] Retired Senior Judge assigned to the Superior Court.

changed the primary goal of the permanency plan from reunification to adoption, pursuant to the Juvenile Act. ***See generally*** 42 Pa.C.S.A. § 6351. Four months later, while Father's goal change appeal was pending, the court[1] terminated Father's parental rights, pursuant to the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511(a)(2), (5); (b). Father appealed that decision as well. ***See*** 461 WDA 2023. After review, we affirm both the goal change order and the termination decree.

The relevant factual and procedural history is as follows. This matter involves only Father and the Child; C.G. (Mother) voluntarily relinquished her rights. The Child was born in July 2021. At the inception of this case, Father, Mother, and the Child lived with Mother's four other children – the Child's siblings.[2] On July 24, 2022, the Erie County Office of Children and Youth (the Agency) learned of allegations involving the physical abuse and improper discipline of one the siblings. It was reported that Father and Mother had left Child alone with the siblings. The parents expected the eldest sibling, age 12, to babysit the siblings, including the one-year-old subject Child. While the parents were away, another sibling, age 7, went to a neighbor's house. As punishment, the parents directed the 7-year-old to stand against a wall for an

---

[1] At that point, the juvenile court judge was sitting as the orphans' court.

[2] Only the subject Child is at issue in this case. The other children are S.D. (age 12), A.G. (age 9), C.G. (age 8) and G.G. (age 6) (collectively, the siblings). The siblings have a different father. The siblings are not the subject of these proceedings. We note further that Appellant-Father has other children, who were also involved with the Agency. Those children are placed outside of Father's care and are not involved in these proceedings either.

hour. Father then repeatedly spanked the sibling with a large metal spoon. Apparently, Father broke the spoon during the punishment. The sibling also urinated while being hit and was forced to clean it up afterwards. The siblings subsequently disclosed that the parents routinely used physical discipline.

Three days later, on July 27, 2022, the Agency conducted a home visit. The 12-year-old sibling showed the caseworker a video of Mother disciplining one of the Child's siblings. In the recording, Mother threatened to punch the sibling and used profanities. The 12-year-old sibling said she is expected to care for the younger children, including cooking and cleaning. The 12-year-old sibling said she is beaten if the other children do not do what they are supposed to do. Another sibling had a burn, which the sibling said was the result of operating the grill.

The Agency removed the Child and the siblings from the home. The siblings were placed with the maternal grandmother, while the Child, who was considerably younger than the siblings and required more attention, was placed with foster parents who had experience with trauma. *See* Trial Court Opinion, dated 1/20/23, regarding 1490 WDA 2022 (T.C.O. 1), at 9 (citing N.T. (11/21/23) at 19).

The Agency subsequently filed dependency petitions for the Child and siblings. The Agency alleged in Mother's petition that she had an extensive history with the Agency, dating back to 2015. She had been previously indicated as a perpetrator of abuse, and she had a criminal history for reckless endangerment. The Agency alleged in Father's petition that he also had an

extensive history of Agency involvement, dating back to 2014. Father had a criminal history for public drunkenness and defiant trespass.

The juvenile court held an adjudicatory hearing on August 9, 2022. Father stipulated to the allegations in the petition with some amendments. He agreed to the following permanency plan: 1) contact the agency to sign releases and schedule home visits; 2) participate in a mental health evaluation and subsequent recommendations; 3) participate in an anger management program; 4) participate in a drug and alcohol assessment; 5) participate in random urinalysis; 6) maintain safe and stable housing; 7) maintain employment; 8) participate in an approved parenting program; 9) participate in a separate psychological evaluation with Dr. Peter von Korff; and 10) participate in a psychiatric assessment.

The juvenile court conducted the first permanency review hearing on November 21, 2022. The court learned that Mother and Father were criminally charged for the abuse of one of the siblings, and that the criminal investigation was still ongoing. The court heard testimony about the parents' history with the Agency, including prior instances of abuse. Critically – and most central to this matter – the court also heard testimony that the one-year-old subject Child had been abused as well.

The caseworker testified that once the Children were removed, they were referred to a clinic for a closer medical examination. The medical records indicated that the Child's "skeletal survey revealed a definite healed R 10th posterior rib fracture and concern for a right parietal skull fracture…" ***See***

T.C.O.1 at 6 (citations to the record omitted). Regarding the parietal skull fracture, the medical records stated:

> Though there are accidental ways a parietal skull fracture can occur, there would have been swelling of this area and he would have had pain at the time this injury occurred, and there is no record of seeking any medical care – in the setting of the rib fracture, the skull fracture also is concerning for physical abuse and the situation raises concern for medical neglect.

*Id.* (citations omitted).

The caseworker also testified that the Agency was unsure what realistic services it could provide Father:

> Caseworker: We have many services in Erie County. I don't know – I've been a caseworker for five years, and I don't know what service you can put in the home. A parent should know not to beat their kid, to not talk to their child that way. You can put in homemakers family preservation, provide some education, but how do you go in and tell a parent – teach – you don't talk to your kid – we don't beat them. […] There are many – we are blessed with of services [*sic*] in Erie, and we have services in there to help them gauge them in the right direct, but honestly, how do you get there to tell them? They should know you can't act like that. You can't abuse your children. […] You can't use extreme corporal punishment. You can't try to bend and flex the laws in corporal punishment to where your children -- we have severely traumatized children in this case. Years of abuse as indicated in our system and our childline calls. I'm not sure what service we can provide to help.

T.C.O. 1 at 7 (citing N.T. 11/21/23 at 28)

The caseworker went on to testify that, based on her conversation with Father, Father believes the Child and siblings were wrongfully detained. She also testified that Father does not think either he or Mother did anything wrong. The caseworker also testified that Father supposed the 11-month-old Child was injured because he always jumps off the bed. Finally, the caseworker testified that Father had been involved with the Agency for years, and that the Agency had addressed Father's parenting before, but to no avail:

> Caseworker: [Father,] in his assessment with Dr. von Korff[,] goes into pretty good detail about his parenting issues of corporal punishment. Again, Your Honor, I don't know what service we can put in there to teach [the parents] to not use – we can provide education, but it appears even with his history – they have [had open cases] before. They were provided family preservation. They haven't learned anything.
>
> I'm sorry. They haven't learned anything. They were open for two years, provided these services, and yet here we are years later, a time later, and we're still doing the same thing, hurting kids.

*Id.*

At the conclusion of the November 2022 permanency review hearing, the guardian *ad litem* recommended a concurrent goal of reunification and adoption. The GAL made this recommendation after recognizing the safety risk posed to the children, as well as the siblings' stated affection for Mother. The GAL stated: "I don't have much belief that anything is going to change,

but at this point in time, trying to juggle their stated affection has me asking merely for a concurrent goal at this point." *See* N.T., (11/21/23) at 44.

The juvenile court determined that Father had been moderately compliant with the service plan, but that he had made no progress toward alleviating the underlying causes of the original placement. The court ultimately changed the goal of the subject Child's permanency plan from reunification to adoption:

> [The juvenile court] determined based on the length of time the Agency had attempted to work with and provide services to the parents; the nature and extend of the abuse to the children; the prior physical abuse to [sibling C.G.] at one year old at the hands of Mother, the *prima facie* evidence of abuse to [the subject Child, M.J.,] who was also one year old; the need for the children to have a safe living environment; and the pending criminal charges against the parents; reunification was not in the Children's best interest and changed the goal to adoption.

T.C.O. 1 at 9 (citing N.T. (11/21/23) at 44-46).

Although the court relieved the Agency of its obligation to provide services, we note that the Agency did not allege the existence of "aggravated circumstances" as defined by the Juvenile Act. *See* 42 Pa.C.S.A. § 6341(c.1); § 6303 (definitions). Instead, the juvenile court was seemingly under the impression that a goal change order relieved the Agency of its obligation to provide services.[3]

---

[3] Whether a goal change relieves a child protective services agency from providing reunification services is not a settled question. *See In re R.J.T.*, 9
*(Footnote Continued Next Page)*

Father timely appealed the goal change decision. **See** 1490 WDA 2022. Even though the appeal was pending, the juvenile court continued to hold permanency review hearings, as is proper procedure. **See In re H.S.W.C.-B.**, 836 A.2d 908, 911 (Pa. 2003).

In January 2023, the Agency filed a petition to terminate Father's rights, alleging that grounds were established under 23 Pa.C.S.A. § 2511(a)(2) and (b). Then, on March 14, 2023, two days before the orphans' court held the termination hearing the Agency amended its petition to include Section 2511(a)(5). Meanwhile, Mother voluntarily relinquished her rights to the Child and the siblings. The orphans' court conducted Father's termination hearing on March 16, 2023. [4] We discuss the details of that hearing when we address Father's termination appeal, but it suffices to say here that the court terminated Father's rights and issued a final decree on the same day. Father appealed the termination decree as well.

Notably, a prior panel of this Court continued the goal change appeal to consolidate it with the termination appeal. As an initial matter, we address the atypical procedural disposition presented in this case. Our Supreme Court has ruled that an order changing the permanency goal constitutes a final,

---

A.3d 1179, 1186 n.9 (Pa. 2010). Ultimately, as we discuss **infra**, it is a question we do not reach, because Father failed to preserve the issue.

[4] The Child was represented by his GAL during the termination proceeding. The representation was proper under 23 Pa.C.S.A. § 2313(a), as the Child's best interests did not conflict with his legal interests. **See In re Adoption of K.M.G.**, 240 A.2d 1218, 1223-24 (Pa. 2020).

appealable order. **H.S.W.C.-B.**, 836 A.2d at 911. However, due to the time needed for an appellate review, and in order to avoid gamesmanship, orders changing the goal remain in effect pending appellate review. **Id.** "[A]ll statutory review hearings should continue at the prescribed intervals; generally, a stay should not be ordered and proceedings halted pending the appeal." **Id.**

Relatedly, this Court has held that a termination of parental rights decree, once affirmed, renders moot any challenge to the dependency court's decision to change the goal of the permanency review hearing. **See D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020) (holding that an issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect) (citing **In re D.A.**, 801 A.2d 614, 616 (Pa. Super. 2002)) **see also In re Adoption of A.H.**, 247 A.3d 439, 446 (Pa. Super. 2021) (holding that a decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change a child's goal to adoption).

This Court has relied on **D.R.-W.** when presented with a goal-change appeal contemporaneously with a termination appeal. In such cases, the lower court will typically terminate the appellant's rights and change the goal at the same time. The appellant then files separate appeals, seeking to contest the goal change in the event the appellant successfully overturns the termination decree. It is our practice, then, to address the termination matter

first, and if we affirm the decree, we will then deem the goal-change appeal moot.

Here, by contrast, Father timely appealed the goal change decision months before the termination decree. For that reason, it is prudent to address the substance of Father's goal change appeal. Even if the goal change issue was later rendered moot by the termination decree, the sequence of these appeals compels us to address Father's arguments in full. *See In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (holding that the mootness doctrine applies when, *inter alia*, the question presented is capable of repetition and apt to elude appellate review).

## I. Goal change appeal, 1490 WDA 2022

Father presents three questions in his goal change appeal:

1. Whether the juvenile court committed an abuse of discretion and/or error of law when it concluded that the Agency established, by clear and convincing evidence, the grounds for a change in goal to adoption, pursuant to 42 Pa.C.S.A. § 6351(f).

2. Whether the juvenile court committed an abuse of discretion and/or error of law when it concluded that the Agency established, by clear and convincing evidence, that the current permanency goal of reunification was no longer feasible?

3. Whether the juvenile court committed an abuse of discretion and/or error of law when it concluded that the Agency had established, by clear and convincing evidence, that the Agency shall no longer provide services to the Appellant?

Father's Brief (1490 WDA 2022) at ix.

Although Father presents three separate questions, he subsequently collapses those questions into a single argument – simply, whether the court committed a reversible error when it changed the permanency goal. **See generally id.** at xv-xix.[5]

We are guided by the following scope and standard of the review. "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted).

We have explained:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the

---

[5] In contravention of Pa.R.A.P. 2119, Father does not divide the argument section of his Brief "into as many parts as there are questions to be argued," nor includes a "distinctive" header. Critically, when it comes to Father's third question presented (relating to cessation of services), Father provides no discussion or citation to authorities. Thus, to the extent he even meant to preserve that claim, we deem that issue waived. **See Commonwealth v. Cannavo**, 199 A.3d 1282, 1289 (Pa. Super. 2018) ("We shall not develop an argument for an appellant, not shall we scour the record to find evidence to support and argument; instead, we will deem the issue to be waived.").

1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re A.B.,* 19 A.3d 1084, 1088 (Pa. Super. 2011) (citing *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006)) (further citations and footnotes omitted) (emphasis original).

Although the relevant statutory provisions of the Juvenile Act do not reference the phrase "goal change," the phrase has become a term of art. *R.J.T.*, 9 A.3d at 1183, n.6. The concept of a "goal change" is consistent with 42 Pa.C.S.A. § 6351(g), which requires the juvenile court, at the conclusion of a permanency review hearing, to "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." *Id.* Such a decision is synonymous with a decision to continue or change the permanency plan goal. *Id.*

To arrive at this decision, the juvenile court must consider the following matters at the conclusion of each permanency review hearing:

> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

[…]

42 Pa.C.S.A. § 6351(f) (some factors omitted).

Based on the determinations under Section 6351(f), the juvenile court must then determine the best permanency plan option under 42 Pa.C.S.A. § 6351(f.1), which includes reunification and adoption:

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

[…]

42 Pa.C.S.A. § 6351(f.1)(1)-(2).

"Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies

- 13 -

with a reunification plan." *In re R.M.G.*, 997 A.2d 339, 347 (Pa. Super. 2010)

(citing *In re N.C.*, 909 A.2d 818, 826-27 (Pa. Super. 2006)). Specifically,

where a parent's skills remain problematic, a goal change to adoption might

be appropriate, regardless of the parent's compliance with a permanency plan.

*R.M.G.*, 997 A.2d at 347; *see also In re A.K.*, 936 A.2d 528, 534 (Pa. Super.

2007).

In its Pa.R.A.P. 1925(a) opinion, the court explained its findings and

reasons for the goal change:

> As previously set forth, the record reflects Father was residing with Mother, her four children and M.J. [(the subject Child)] when the five children were removed from the home due to allegations of physical abuse perpetrated on them by both parents. At the time of the hearing, Father was being criminally charged as a perpetrator of physical abuse regarding [one sibling], and investigated for allegations of physical abuse to [another sibling], and M.J.
>
> Additionally, M.J. suffered a fractured rib and skull fracture while in the care of his parents, yet Father never sought medical care for his one-year-old, who suffered injuries that would have caused pain in his ribs and pain swelling to his skull.
>
> While the court found Father to be moderately compliant with his treatment plan, the record reflects [he] has failed to acknowledge the reasons that led to the removal of all of the children in his home. In his psychological evaluation, Father told Dr. von Korff he did not do anything wrong and believes physically disciplining the children was necessary and appropriate. Further, [the Agency caseworker] testified that Father has voiced that the children have been wrongfully detained by the Agency and placed back in his care.
>
> Regarding Mother, Father stated he believes she goes out of her way not to hurt the kids. Finally, Father's only explanation for M.J.'s injuries is that he jumped off the bed.

> Where a parent fails, as Father does here, to acknowledge the circumstances that necessitated M.J.'s removal, *i.e.,* physical abuse and neglect, it is impossible for the Agency to provide a service to rectify that.
>
> Ultimately, these children were all living with Father at the time of the removal; and even assuming he was not the perpetrator of the physical abuse to M.J., he at a minimum failed to protect him, or any of the other children from Mother. Father's continued belief that neither one of them has done anything wrong prevents a goal of reunification from being in M.J.'s best interest.

T.C.O. 1 at 14-15 (style adjusted).

On appeal, Father argues the court abused its discretion for two reasons. Father argues the court should have ordered a concurrent goal (reunification and adoption), as suggested by the guardian *ad litem*. Additionally, Father cites to the court's finding that he made moderate progress in his reunification plan.

In our review, we note the GAL's concurrent goal recommendation was based on the children's statements that they still loved the parents.[6] It was the GAL's belief that an immediate move toward adoption might not be in the siblings' best interest, because even though the parents posed a safety risk, an immediate severance of their relationship might cause them harm. This position is reasonable. For one thing, concurrent goal planning is a best practice recognized by the Dependency Bench Book. ***R.J.T.***, 9 A.3d at 1191, n.14 (citing *Pennsylvania Dependency Benchbook* (2010) § 10.4 at 96).

---

[6] The siblings referred to Father as "daddy," even though he was not their biological father.

Moreover, we have said that even though a goal change does not terminate a parent's rights, changing the goal to adoption might not be appropriate if severing an existent parent-child bond would have a detrimental effect. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019) (citing *In re N.C., supra,* at 824; *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

Here, however, the subject Child was only a year old. We question whether the GAL's recommendation pertained to M.J. at all. And we note further that the GAL provided an appellate brief in support of the goal change. But more to the point, the GAL's recommendation is merely that – a recommendation. The GAL's position during the dependency proceedings is not a substitute for the court's judgment and independent analysis under Section 6351(f).

We are also unpersuaded by Father's argument that his participation in the reunification plan should defeat the goal change. Notwithstanding Father's participation, the record supported the court's finding that Father either does not understand, or refuses to accept, why the Agency intervened in this case. The juvenile court heard the caseworker's testimony that the Agency was at a loss, that it did not know what services it could provide – beyond those it already provided – which could make Father understand that his form of "discipline" constituted child abuse. As noted above, a goal change might be appropriate where the parent lacks sufficient skills to care for the child, despite the parent's participation with the reunification plan. *See R.M.G.*, 997 A.2d at 347; *see also In re A.K.*, 936 A.2d at 534.

Although this Child's dependency case had only been opened for three months at the time of the goal change, the Agency was involved with Father for some time. The instant case was not Father's first experience with a reunification plan. It was apparent to the court that reunification could not be achieved any time soon, if at all. We cannot conclude that the juvenile court's goal change decision was an error of law or an abuse of discretion.

## II. Termination appeal, 461 WDA 2023

Having disposed of Father's goal change appeal, we turn to Father's appeal from the termination decree. Father presents the following issues for our review:

> 1. Did the orphans' court abuse its discretion in proceeding to hold a hearing on what was, in effect a new petition without Father having the benefit of required notice?
>
> 2. Did the orphans' court abuse its discretion in terminating Father's parental rights when the record is comprised of insufficient competent evidence to establish grounds for termination?
>
> 3. Did the orphans' court abuse its discretion by finding that severance of Father's parental rights would serve the Child's best interests?

Father's Brief (461 WDA 2023) at 7 (style adjusted).

In his first appellate issue on the termination appeal, Father alleges the orphans' court violated his right to due process when it permitted the Agency to proceed with its amended petition. Recall that the Agency filed the original termination petition in January 2023. In the original petition, the Agency

alleged that termination was warranted under 23 Pa.C.S.A. § 2511(a)(2) and (b). On March 14, 2023, two days before the court held the termination hearing, the Agency amended its petition to allege a separate ground – Section 2511(a)(5). Father claims the amended petition did not comply with 23 Pa.C.S.A. § 2313, which provides that the parent must receive at least ten days' notice. Father maintains that the amended petition constitutes an entirely new petition, and because this new petition lacked proper notice, the orphans' court erred when it held the termination hearing. Father concludes a remand is necessary.

It is well-settled that any individual whose parental rights are to be terminated must be afforded due process – that is, certain procedural safeguards. **See In re Adoption of K.M.D.**, 261 A.3d 1055, 1059 (Pa. Super. 2021) (citing **In re A.N.P.**, 155 A.3d 55, 66 (Pa. Super. 2017) and **In re Interest of K.B.**, 763 A.2d 436, 439 (Pa. Super. 2000)); **see also Santosky v. Kramer,** 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." **A.N.P.**, 155 A.3d at 66. (citation omitted).

Although we have explained that due process "is flexible and calls for such procedural protections as the situation demands," we are unwilling to

allow the termination of parental rights "without **strict compliance** with the procedures set forth by the Legislature…." **Id.** at 66, 68 (citing **In re Adoption of K.G.M.**, 845 A.2d 861, 865 (Pa. Super. 2004)) (further citation omitted) (emphasis original).  Strict compliance is warranted in termination matters because of the gravity of such cases.[7]

Having underscored the constitutional rights implicated, and the necessity for strict compliance with procedure, we identify the specific provision at issue here. The Adoption Act explicitly addresses the notice requirement in matters concerning the involuntary termination of parental rights, and how that notice shall be served:

### § 2513. Hearing

**(a) Time.**--The court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for

---

[7] **See K.M.D.**, 261 A.3d at 1059-60; **see also In re Adoption of M.R.D.**, 145 A.3d 1117, 1129 (Pa. 2016) ("termination of parental rights is one of the most serious and severe steps a court can take"); **In Re: Adoption of: C.M.**, --- A.3d ---, 2021 WL 3073624, at *12 (Pa. 2021) (stating that a termination is the "civil law equivalent to the death penalty, forever obliterating the fundamental legal relationships between parent and child.") **see also Kimock v. Jones**, 47 A.3d 850, 855 (Pa. Super. 2012) ("termination of parental rights for all practical purposes ends the parent/child relationship as unequivocally as the death of the child"); **and see** Administration Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook*, "Termination of Parental Rights" at § 17.1 (3d ed. 2019) (Termination of parental rights "has often been called the 'death penalty' of dependency court, because of the seriousness and finality of a termination order severing all ties between a child and the biological parents.").

involuntary termination) which shall be not less than ten days after filing of the petition.

**(b) Notice.--**At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require. […]

23 Pa.C.S.A. § 2513(a)-(b).

Relying on the general, more elastic, notions of due process, the orphans' court reasons that the amended petition was proper because Father was still on notice of the termination generally. *See* Trial Court Opinion, 6/16/23, regarding 461 WDA 2023 (T.C.O. 2) at 16-17. The court also reasons the amended petition was proper, because the *method* of service was proper. *See* T.C.O. 2, at 17 (citing Pa.O.C. Rule 15.6(a)). The Agency argues that its amended petition was proper because the method of service was proper. *See* Agency's Brief at 10.

Upon review, we are troubled by the Agency's inclusion of a last second amendment. Although the grounds for termination under Section 2511(a)(2) are similar as those under Section 2511(a)(5), they are by no means identical. We share Father's concern that an untimely amended petition could "in effect submarine responding parties with a completely different case to defend." *See* Father's Brief at 11. Contrary to the position of the Agency and the rationale of the orphans' court, we do not see how the method of service has any bearing on the timing of service. The issue is not whether Father properly received the amended petition, but whether he had enough time to prepare

to defend the additional ground. Not only did the Agency fail to give Father 10 days' notice, as set forth in Section 2513, but the Agency hardly gave Father two days' notice. Quite clearly, the inclusion of Section 2511(a)(5) was out of bounds.

The question now becomes whether the improper inclusion of Section 2511(a)(5) constitutes reversible error. Although the orphans' court terminated Father's rights under Section 2511(a)(5), the court also concluded that the Agency met its burden under Section 2511(a)(2). This Court needs only agree with the orphans' court as to any one subsection under Section 2511(a), as well as (b), to affirm the termination of a parent's rights. ***See, e.g., In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). And as we discuss below, we conclude that the record supports the court's termination of Father's rights under Section 2511(a)(2).

Ultimately, we disagree with Father's argument that improper inclusion of Section 2511(a)(5) in the amended petition would defeat termination under Section 2511(a)(2), which was properly noticed in the original petition. We are guided by our decision in ***In re Adoption of J.N.F.***, 887 A.2d 775 (Pa. Super. 2005). In ***J.N.F.***, the father was served with a termination petition. The court then held a hearing to determine whether the father planned on contesting the termination. The father did not participate, nor did he respond to the inquiry of whether he desired to be appointed counsel. At the time, father was incarcerated. In any event, the termination proceeding was scheduled. A little more than two weeks before the hearing, the local agency

- 21 -

filed an amended petition. Although the father received the original termination petition, father did not receive the amended petition. The court subsequently terminated the father's rights. On appeal, he alleged that he lacked notice, among other issues.

This Court noted the error but found it harmless. We first explained that the trial court's jurisdiction was invoked by the original termination petition, of which the father had proper notice. *J.N.F.*, 887 A.2d at 781. We also noted that Father did not respond when asked whether he would challenge the termination. We held:

> Technically, [the agency] should have served the amended petition on [the father] to permit him an opportunity to respond to its specific allegations. However, inasmuch as we have already found that [the father] failed to take proper steps to challenge the termination proceedings, the failure of [the agency] to inform [the father] of the specific allegations it was averring against him in the amended termination petition was irrelevant. Therefore, whatever error was occasioned by [the agency's] failure to serve the amended termination petition on [the father] was harmless.

*Id.* at 781-82.

Instantly, the orphans' court, the Agency, and GAL rely on *J.N.F.* for the proposition that once Father was properly served with the original petition in January 2023, thereby invoking the court's jurisdiction, any subsequent amendment was allowable. We disagree with this assertion. Instead, we find *J.N.F.* to be analogous insofar as we may conclude that an improper amendment does not necessarily undo the propriety of the original petition.

Because Father had received proper notice of Section 2511(a)(2), he was able to defend against that claim. The improper inclusion of Section 2511(a)(5) did nothing to change this fact. We will not conclude that the inclusion of Section 2511(a)(5), in an improper amendment, renders invalid the inclusion of Section 2511(a)(2) in the original petition. Instead, the remedy is to limit our review to the court's decision under Section 2511(a)(2). Perhaps in a different case, we would be persuaded by Father's argument that an improper amendment sullies the rest of the petition. But as Father concedes in his Brief, that was not what happened here. **See** Father's Brief at 11. In short, we conclude that the orphans' court committed an error when it permitted the Agency to proceed on Section 2511(a)(5); however, we conclude the error was harmless because the Agency could properly proceed on Section 2511(a)(2).

We turn now to the substantive termination analysis, beginning with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

As we discussed above, the only ground the Agency properly preserved under Section 2511(a) was Subsection 2511(a)(2). Thus, we address the court's decision to terminate Father's rights under that Subsection, which provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights under Section 2511(a)(2), the Agency must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal cause the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *C.M.K.*, 203 A.3d at 262. The grounds for termination are not limited to affirmative

- 25 -

misconduct, but concern parental incapacity that cannot be remedied. ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. ***Id.***

In its Rule 1925(a) opinion, the orphans' court cited the testimony of several witnesses it relied upon to reach its decision. Kristine Kirkpatrick, the Agency's intake caseworker, testified about the law enforcement's investigation into the Child's injuries. Mother and Father were subsequently charged with Endangering the Welfare of a Child for failing to obtain medical care. Father also had pending charges of Simple Assault and Endangering the Welfare of a Child, as they relate to the abuse of the Child's sibling. ***See*** T.C.O. 2 at 8 (citations to the record omitted).

Karin Wickwire, a nurse practitioner and forensic examiner, testified as an expert in the field of child maltreatment. She testified that the Child had a "parietal skull fracture" and "healing fracture of the right tenth rib in the back, posterior rib." She said these injuries likely occurred several weeks before their discovery, although the rib fracture was more recent. ***Id.*** at 9-10 (citations to the record omitted). The rib fracture was diagnostically labeled as physical child abuse. ***Id.***

Dr. Peter von Korff, an expert in the field of child psychology, conducted an interview with Father and the siblings; the subject Child was too young to be interviewed. Dr. von Korff testified that the children lived in a culture of insecurity, abuse, corporal punishment, and neglect. ***Id.*** at 11. Dr. von Korff

- 26 -

testified that Father did not believe there was anything wrong with disciplining the sibling, even though the "discipline" resulted in an assault charge. Dr. von Korff also testified that Father continued to lack insight into the seriousness of the subject Child's injuries. For instance, Father did not ask who hurt the Child or how the Child got hurt. Instead, Father was upset at the Agency for intervening, which he felt was unwarranted and wrong. *Id.* at 12. Critically, Dr. von Korff testified that while Father had some basic parenting skills "that could be worked with," the services that were already in place would not benefit Father. Dr. von Korff testified that Father would need "attachment oriented psychotherapy," which would be a "long term commitment" and would require Father's buy in. *Id.* (citations to the record omitted).

Finally, the orphans' court noted the testimony of the Agency's caseworker, Molly Freeborough, who testified about the family's history with the Agency. Ms. Freeborough testified that Father began living with Mother in January 2020. At that time, the household, including Father, had been the subject of an open investigation, and the family was receiving services. *Id.* at 13. Between January 2020 and March 2022 – (the Child was born in July 2021) – the Agency had received numerous reports regarding "inappropriate discipline; drug and alcohol use; poor living conditions; and lack of supervision." *Id.* However, the Child and the siblings were permitted to stay at home. The case was closed on March 17, 2022.

In May 2022, the Agency received a report that Father's son – another non-subject sibling – had engaged in inappropriate touching with another sibling in the household. The Agency also received a report that there were concerning marks and bruises on another sibling. After an investigation, the case was closed on June 1, 2022. On June 21, 2022, the Agency received another report about inappropriate touching among the siblings. However, Father declined services. *Id.* at 13-14.

The next report was on June 24, 2022, involving Father's discipline of a sibling with the spoon – the event which triggered the Child's removal from Father's care. Ms. Freeborough testified that Father had been belligerent and combative throughout the case, that he had taken no responsibility for the removal of the Child, and believed that his methods of discipline were appropriate. *Id.* at 14.

On appeal, the crux of Father's argument is that he was compliant with the reunification plan, that he had made moderate progress, and that the court terminated his rights too soon. *See generally* Father's Brief at 15-18.[8]

After review, we discern no abuse of discretion or error of law. To the extent that the Agency filed a termination petition soon after the Child's removal, the timing of such a petition is relative. When the Child was removed

---

[8] Father's Brief on this appeal (461 WDA 2023), like his Brief concerning the goal change order (1490 WDA 2022), also circumvents Pa.R.A.P. 2119. Again, Father does not divide his argument section into corresponding headings. *See* Footnote 5, *supra*. Waiver is not appropriate in this case, however, because it is still possible to follow his argument.

in July 2022, the Agency had been involved with the family for over two years, and nearly a year before the Child's birth. By the time the court held a hearing on the Agency's termination petition in March 2023, Father had demonstrated all three prongs of the Section 2511(a)(2) inquiry.

First, Father had demonstrated repeated and continuous course of conduct that involved abuse and neglect. But to the extent that such abuse and neglect was merely poor parenting skills, Father was also told to adjust those parenting skills. He refused. And that refusal also constitutes a refusal to parent. Second, as a result of Father's conduct, the Child had to be removed and thus was without necessary parental care. Third, the conditions which led to the Child's removal – call it "abuse," "neglect," or more generously, "poor parenting" – cannot or will not be remedied.

As to the third prong, Dr. von Korff testified that Father would need to participate in long term therapy to improve his parenting skills – that the standard services, including a 12-week anger management course, would be insufficient. Critically, however, even this long-term therapy approach would require Father's "buy in." But Father has made it clear that he has no interest in buying into any remedial effort that would address the underlying cause of the Child's removal. Therefore, we conclude that the record supports the orphans' court's termination decision, notwithstanding the fact that the Agency moved relatively quickly in this case. Father's second appellate issue merits no relief.

Having concluded that the orphans' court did not err or abuse its discretion under the first prong of the termination analysis under Section 2511(a), we next review the court's conclusion that termination would best serve the Child's needs and welfare under Section 2511(b). That subsection provides, in relevant part:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

This Court has explained:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

- 30 -

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, the court is not required to use expert testimony to resolve the bond analysis. *In re Z.P.*, 994 A.2d 1108, 1121 (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)). Finally, we emphasize that "[w]hile a parent's emotional bond with [their] child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

On appeal, Father argues "there is no evidence of record in this matter that the bonds between the parent and the child were evaluated at all, and it does not appear that any witness offered testimony as to the negative effect that severance of the bond may have on the subject Child." *See* Father's Brief at 18. Father also notes that the Child was not placed with a pre-adoptive foster parent, and in fact, at the time of the termination hearing, the Agency was contemplating a kinship placement with a paternal aunt in Arizona. Father cites the Agency's permanency case worker – Michael Vicander – who testified that a kinship placement can have the effect of improving the relationship between parents and children. Thus, according to Father, termination would

not be in the Child's best interest if the plan for the Child's permanency involves an improved bond between Father and the Child. ***See id.*** at 18-19.

After review, we conclude Father's argument merits no relief. First, we recognize that when there is no evidence of a bond, it is reasonable to infer that none exists. ***K.Z.S.***, 946 A.2d at 762-63. Perhaps more to the point, the bond question is not merely whether one exists, but whether termination would destroy a necessary and beneficial relationship. ***See J.M., supra.*** The record clearly supports the notion that, to the extent Father and the Child had a bond, it was not of the sort that should be preserved. The Child suffered injuries that constituted child abuse. Whether Child suffered these injuries at the hands of Father, or because of Father was neglectful, neither would suggest a worthwhile parental bond. Mindful of the "culture of insecurity, abuse, corporal punishment, and neglect" that was the Child's homelife prior to removal, we cannot conclude that the court erred when it determined there was no bond worth preserving.

Of course, the bond question is one aspect of the best interest analysis. ***See N.A.M.***, ***supra.*** To that end, we note that the caseworker testified that the Child needed extra attention following his removal. Indeed, the Child's behavioral issues were significant enough that they proved too great for an experienced foster family. All taken together, these facts support the court's decision that termination would best serve the Child's needs and welfare under Section 2511(b). Father's third appellate issue merits no relief.

In sum: we conclude that Father's appeal from the goal change order, docketed at 1490 WDA 2022, is moot considering the subsequent termination of his parental rights. Nevertheless, given the sequence of these events and that this type of goal change appeal was apt to elude appellate review, we addressed the substance of Father's claims and conclude that the goal change was proper. Next, we conclude that the orphans' court erred when it entertained termination under Section 2511(a)(5). The Agency's amended petition did not afford Father with sufficient notice. However, that error was harmless, because Father was still provided proper notice of the Agency's intention to terminate his rights under Section 2511(a)(2). We further conclude that the court did not abuse its discretion or commit an error of law when it ruled that the Agency established grounds for termination by clear and convincing evidence under Section 2511(a)(2) and (b).

Goal change order affirmed. Termination decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/09/2024